# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Augustine Pacheco and
Vicki Hansen, for themselves
and others similarly-situated,

Civil No. 17-5048 (SRN/HB)

Plaintiffs,

**AMENDED
MEMORANDUM OPINION
AND ORDER**

v.

Honeywell, International Inc.,

Defendant.

---

John G. Adam, Legghio & Israel, P.C., 306 South Washington Avenue, Suite 600, Royal Oak, Michigan 48067, and Katrina E. Joseph, Teamsters Local No. 120, 9422 Ulysses Street Northeast, Suite 120, Blaine, Minnesota 55434, counsel for Plaintiffs.

Donald M. Lewis, Jeremy D. Robb, and Joseph G. Schmitt, Nilan Johnson Lewis PA, 120 South Sixth Street, Suite 400, Minneapolis, Minnesota 55402; Craig S. Primis, Kathleen Ann Brogan, and Kenneth Winn Allen, Kirkland & Ellis, 655 15th Street Northwest, Suite 1200, Washington, D.C. 20005, counsel for Defendant.

---

SUSAN RICHARD NELSON, United States District Judge

Plaintiffs Augustine Pacheco and Vicki Hansen filed this suit on November 7, 2017, on their own behalf and on behalf of similarly-situated retirees, under the Employment Retirement Income Security Act (ERISA) and the Labor Management Relations Act (LMRA). They assert claims against their former employer Honeywell International, Inc. ("Honeywell") for breaches of certain collective bargaining agreements

1

("CBAs") that they allege contain collectively-bargained promises of Honeywell-sponsored healthcare benefits until age 65 for employees who took early retirement under the Honeywell-sponsored benefits plan. (See Compl. ¶¶ 103-39 [Doc. No. 1].)

Shortly after filing this suit, Plaintiffs moved for injunctive relief, seeking an order prohibiting Honeywell from terminating their healthcare coverage, and their families' coverage, which was set to expire January 1, 2018, during the pendency of this litigation. (See Pls.' Mot. for Prelim. Inj. at 1 [Doc. No. 18].) Following an expedited briefing schedule and a December 21, 2017 motion hearing, the Court issued a provisional ruling on December 29, 2017, granting Plaintiffs' request for a preliminary injunction through January 31, 2018. (See Dec. 29, 2017 Order [Doc. No. 39].) The ruling was provisional because the Court had only four business days between Christmas and New Years in which to issue the order. The Court stated that it would thoroughly review the record and the pertinent authorities and issue an amended order no later than January 31, 2018. (See id. at 32.)

Now, having had the opportunity to conduct its thorough review, the Court issues this Amended Order. For the reasons set forth in the December 29, 2017 Order, incorporated herein, and below, Plaintiffs' Motion for a Preliminary Injunction is granted, pending an adjudication on the merits of Plaintiffs' claims or further order of this Court after notice and hearing.

## I.    BACKGROUND

Plaintiffs Pacheco and Hansen are former members of the production and maintenance collective bargaining unit at Honeywell's Minnesota facilities and were represented by the International Brotherhood of Teamsters Local 1145 ("the Union"). (See Compl. ¶ 5.)   Defendant Honeywell is a Fortune 100 company, with operations in approximately 1,250 cities throughout the world, with sales of approximately $38 billion. (Id. ¶ 10.)

### A.    Factual History

In 2007 and 2010, Honeywell entered into CBAs with the Union, which included pension and welfare provisions for employees who elected to take: (1) "normal retirement" at age 65 or later; or (2) "early retirement," for employees with at least 15 years of credited service, who were at least 55 years old, but younger than 65, at the time of retirement.  (Id. ¶ 14; Ex. 3 to Pls.' Mot., Art. 24, § 7 (2007 CBA), Ex. 5 to Pls.' Mot., Art. 24, § 7 (2010 CBA).)[1] Employees who took early retirement received a reduced pension for the rest of their lives, based on a formula that accounted for the employees' age and years of service.  (See Compl. ¶¶ 15-16.)   At issue here are the healthcare benefits available to the employees who took early retirement during the periods of the 2007 and 2010 CBAs.

---

[1] All exhibits to Plaintiffs' Motion are found at ECF Doc. No. 21-1 through 21-18.

### 1.    Pre-2007 CBA

Plaintiffs allege that for more than 30 years prior to the 2007 CBA,  Honeywell sponsored and provided healthcare benefits for eligible early retirees, starting from the date of retirement and continuing after the expiration of the CBA in effect when retirement began, until the retiree reached age 65.  (Id. ¶ 20.)   These benefits, Plaintiffs allege, also extended to the retiree's spouse or surviving spouse until age 65, and to the retiree's dependent children until age 26.  (Id.)

In support of these allegations, Plaintiffs point to a 2005-2006 document entitled "Frequently Asked Questions and Answers Regarding Retirement."  (See id. ¶ 21.) Among the information in the FAQ documents, Honeywell provided the following:

> Q:    When I reach age 65 my medical coverage ceases for myself.  I have a spouse and dependents, what medical coverage will they have?
>
> A:    Medical coverage that you had selected for your spouse and eligible dependents continues until your spouse reaches age 65.

(Ex. 1 to Pls.' Mot. (FAQ at 7).)

Plaintiffs also identify a 2001 agreement between Honeywell and the Union concerning severance in the event of restructuring or relocating which also incorporated retiree healthcare benefits.  A section entitled "Insurance Continuation" provides that terminated employees who are eligible to retire "will be eligible for retiree medical in accordance with the terms of the applicable plan."  (Ex. 2 to Pls.' Mot. (2001 Agmt. at 68).)  In addition, in a section labeled "Pension Benefits," it states:  "Employees shall receive Pension benefits in accordance with the provisions of the Pension Plan, including

retiree medical." (Id.)  Plaintiffs contend that this agreement remains in effect.
(See Compl. ¶ 22.)

### 2.    The 2007 CBA

The healthcare benefits provisions in the 2007 CBA are found in Article 24.  In Section 7 of Article 24, entitled "Retiree Health Care (Pre 65 only)" Honeywell promised that it "will provide" certain contributions to the healthcare expenses for its pre-65 retirees, their dependents, and surviving spouses.  (See Ex. 3 to Pls.' Mot., Art. 24, § 7.) It further stated, "The Company does not provide healthcare benefits for Local 1145 retirees after age 65." (Id.)

The first sentence of Section 1 of Article 24 stated that these insurance and benefit plans would be implemented and maintained "as specified by the time periods outlined below for the duration of this Agreement." (Id., Art. 24, § 1.)  The 2007 CBA also contained a general durational clause, stating, "This Agreement shall become effective February 1, 2007 and shall remain in force and effect up to midnight January 31, 2010." (Id., Art. 35, § 1.)

Subsequent to the 2007 CBA, Honeywell appears to have provided its employees with "answers" to questions about the 2007 CBA retiree healthcare coverage, including the following:

> Q:    What healthcare coverage is provided to retirees?
>
> A:    Local 1145 retirees are eligible for healthcare coverage through Honeywell until age 65.  After age 65[,] they are eligible for Medicare with no subsidy from Honeywell.

5

(Ex. 4 to Pls.' Mot. (Answers to Question at 2).)   In the same document, Honeywell

informed its employees that limits on its annual contributions to retiree healthcare

benefits were not expected to "hit until 2018," eight years after the 2010 expiration of the

2007 CBA.  (Id.)

### 3.    The 2010 CBA

The nearly identical healthcare provisions for pre-65 retirees in the 2010 CBA are

likewise found in Article 24 of that agreement.  Again, in Section 7 of Article 24, also

entitled "Retiree Health Care (Pre 65 only)," Honeywell promised that it "will provide"

certain contributions to the healthcare expenses for the pre-65 retirees, their dependents,

and surviving spouses.  (See Ex. 5 to Pls.' Mot., Art. 24, § 7.)  As with the 2007 CBA,

Honeywell stated, "The Company does not provide healthcare benefits for Local 1145

retirees after age 65."   (Id.)

In Section 1 of Article 24, the 2010 CBA also stated that the healthcare provisions

were to be implemented and maintained "as specified by the time periods outlined below

for the duration of this Agreement.  (The plans list a time period 1/1/13–12/31/13, it is

understood that the Agreement expires 1/31/2013.)"  (Id., Art. 24, § 1.)  And, as with the

2007 CBA, the 2010 CBA contained a general durational clause, stating, "This

Agreement shall become effective February 1, 2010 and shall remain in force and effect

up to midnight January 31, 2013."   (Id., Art. 31, § 1.)

The new, different language in the 2010 CBA, pertinent here, outlined certain

procedures for a "Special Retirement Program."  (Id., Art. 24, § 7.)  The procedures

6

applied to employees who retired on or after February 1, 2010, for whom Honeywell

would not contribute any amount toward the retirees' medical premiums, except as

follows:

> Employees who provide the Company with at least four (4) months advance
> written notice of his or her irrevocable decision to retire on a date certain
> between August 1, 2010 and February 1, 2013 and are not terminated for
> cause will be eligible for retiree medical coverage under the 1145 retiree
> medical plan with respect to which Honeywell will contribute towards the
> annual retiree medical premium.

(Id.)

Honeywell provided its employees a document entitled "Pension and Medical

Question[s]" regarding the Special Retirement Program.  (See Ex. 7 to Pls.' Mot. (Pension

& Medical Document).)  In the document, Honeywell stated that the Special Retirement

Program represented a limited window of opportunity during which eligible employees

could take early retirement and still receive medical benefits:

> Q:    If I retire after 2/1/2013 will I have Retiree Medical?

> [A:]    No - 2010 CBA - Effective February 1, 2011, for each employee
> who terminates and retires on or after February 1, 2010[,] Honeywell
> will not contribute any amount toward the annual retiree medical
> [premium] except under the "[S]pecial Retirement Program"
> provision.  Page 38, 1/31/2010 CBA.

> * * *

> Q:    If I retire does my medical insurance end at age 65 when I'm eligible
> for [M]edicare?

> [A:]    Yes - A Co[b]ra type policy is available for your [dependents], but
> you pay the whole premium cost per month.

7

(<u>Id.</u> at 2.)

In addition to the Q&A document, Honeywell provided information in various other forms concerning the pre-65 retirement program. It offered "[v]oluntary, off-shift informational sessions on making the decision to retire," at which one of the covered topics was "[r]etiree medical." (Ex. 8 to Pls.' Mot. (Honeywell Retirement Planning Sessions).) Gregory Harrer, a former Honeywell employee who retired at age 57 in October 2012, attended at least one such session when he was still employed. (Ex. 19 to Pls.' Mot. (Harrer Decl. ¶ 5).) Harrer attests that Honeywell Human Resources and management officials informed the attendees "that as long as we retired under the 'special' procedures we were guaranteed healthcare to age 65." (<u>Id.</u>) Honeywell officials indicated that after turning 65, the retirees "would go on Medicare and [their] Honeywell healthcare would end." (<u>Id.</u>) Another former Honeywell employee, Named Plaintiff Vicki Hansen, retired in January 2013 based on the 2010 CBA's window of opportunity to retire with healthcare benefits. (Ex. 18 to Pls.' Mot. (Hansen Decl. ¶¶ 4-6).) In the fall of 2010, she and a coworker met with the Honeywell Labor Relations Manager Chuck Bengtson and Honeywell Human Resources Director Dave Hanson to discuss retiree healthcare options. (<u>Id.</u> ¶ 5.) Bengtson allegedly assured the employees that if they followed the special retirement process, healthcare benefits until age 65 were guaranteed, and Honeywell could not end the benefits any earlier. (<u>Id.</u>) Moreover, Bengtson noted that the 2010 CBA offered the "last chance to retire with healthcare." (<u>Id.</u>)

Also, Honeywell provided information on the Special Retirement Program

8

application process, and warned, "Effective with the February 1, 2010 [CBA], . . .
Honeywell will no longer subsidize retiree medical benefits for employees who are not
already retired or who do not retire under the Special Retirement Program."  (Ex. 9 to
Pls.' Mot. (Special Retirement Process).)  Further, Honeywell provided "enrollment
worksheets," identifying the costs of different pre-65 retiree medical coverage categories,
and confirming employees' personal and dependent information on file, including birth
dates.  (See Ex. 11 to Pls.' Mot. (Enrollment Worksheet).)

### 4.    Summary Plan Descriptions

Both the 2007 and the 2010 CBAs included references to separate "Summary Plan
Documents" or "SPDs" for additional details.  (See, e.g., Ex. 1 to Jacobs Decl. (2007
CBA at 25-29); Ex. 2 to Jacobs Decl. (2010 CBA at 34-36).)[2]  For example, the 2007
CBA referred to the SPD concerning network basic benefits and the terms and conditions
of the dental and vision benefits under the plan.  (See Ex. 1 to Jacobs Decl. (2007 CBA at
25-27).)

The SPDs issued during the period of the 2007 and 2010 CBAs, which are insurer-
specific, contain two provisions regarding termination of coverage.  Section 7 of the
respective SPDs provides that coverage will cease on the date that the plan is terminated
or canceled, and Section 14 states that Honeywell reserves the right to terminate the plan,
or any portion of it, at any time and for any reason, except as prohibited by law, "or the

---

[2]  All exhibits to the Declaration of Steven Jacobs in Opposition to Plaintiffs'
Motion for a Preliminary Injunction are found at ECF Nos. 33-1 through 33-17.

provisions of a written collective bargaining agent [sic] of an employee or employees entitled to benefits under this Plan."  (See, e.g., Ex. 3 to Jacobs Decl. (2007 BCBS PPO SPD at 97, 115); Ex. 4 to Jacobs Decl. (2007 United Healthcare Choice Plus PPO SPD at 103, 121); Ex. 5 to Jacobs Decl. (2011-2013 BCBS PPO SPD at 123, 141); Ex. 6 to Jacobs Decl. (United Healthcare Choice Plus PPO SPD at 128, 147).)  Similar reservation-of-rights language also appears elsewhere in the SPDs.  (See, e.g., id., Ex. 3 at 2, 6; Ex. at 3; Ex. 5 at 4, 10, 20, 28, 32; Ex. 6 at 4, 10, 20, 28, 32, 147.)

### 5.    Honeywell's Announcement

In late March 2017, Honeywell informed approximately 320 Minnesota early retirees of its intent to terminate their medical and prescription drug coverage, and their dependents' coverage, effective after December 31, 2017, i.e., on January 1, 2018.  (See Ex. 12 to Pls.' Mot. (Mar. 27, 2017 Letter); Ex. 13 to Pls.' Mot. (List of Retirees Receiving Letter).)

A month earlier, Honeywell and the Union had signed a "Memorandum of Agreement" stating that "[t]he parties agree that the Company will terminate retiree healthcare benefits for current retirees no sooner than December 31, 2017 with at least 6 months notice to retirees prior to termination."  (Ex. 7 to Jacobs Decl. (Feb. 1, 2017 Mem. of Agmt.)  On February 4, 2017, a new CBA went into effect that contains no provisions for retiree healthcare benefits.  (See Ex. 17 to Jacobs Decl. (2017 CBA at 40).)

### B.    Procedural History

In this lawsuit, Plaintiffs, who assert breaches of the applicable CBAs and violations of federal law, seek class certification, injunctive relief, reimbursement, damages, and attorneys' fees.  (See Compl. at 34–35.)  They contend that they would not have taken early retirement and given up their jobs had Honeywell informed them of its purported belief that it could terminate their pre-65 medical coverage regardless of their age or the ages of their spouses or dependents at termination.  (See id. ¶ 137.)  On December 12, 2017, they filed the instant motion, seeking an order prohibiting Honeywell from ending, on January 1, 2018, their pre-65 healthcare coverage, and their families' coverage, while this case is litigated.  (See Pls.' Mot. at 1.)

Plaintiffs argue that they have met the four factors of the Dataphase test necessary for preliminary injunctive relief.  (Pls.' Mem. in Supp. Mot. for Prelim. Inj. at 6–7 [Doc. No. 20].)  First, they contend that they are likely to succeed on the merits of their claims because the 2007 and 2010 CBAs unambiguously promised healthcare benefits beginning upon their pre-65 retirement and ending upon turning 65 years old.  (Id. at 9–13.)  Accordingly, they argue, their rights to pre-65 healthcare benefits vested.  (Id.)  This specific language, Plaintiffs assert, trumps the general durational language in the CBAs, which calls for the expiration of the agreements at stated times.  (Id. at 9–10; 14–15.)  Moreover, Plaintiffs assert that their reading of the CBAs is consistent with the contracting parties' intentions, noting Honeywell's many assurances regarding the continuation of healthcare benefits until age 65.  (Id. at 11.)  Second, as to irreparable

11

harm, Plaintiffs contend that the threat of termination of their medical benefits constitutes irreparable injury, and, given the higher cost of replacement coverage, they suffer from anxiety and stress due to the prospect of having to choose between medical care and other necessities of life, often on fixed incomes.  (Id. at 15–16.)  Finally, Plaintiffs assert that the two final factors for awarding injunctive relief—the balance of harms and the public interest—favor them, given the significant impact of the loss of healthcare to them versus the monetary cost to Honeywell of providing the benefits, and the strong public interest in preserving retiree healthcare benefits.  (Id. at 16.)

In opposition, Honeywell argues Plaintiffs satisfy none of the factors necessary for injunctive relief.  First, it contends, Plaintiffs have not shown a likelihood of success on the merits.  (Defs.' Opp'n Mem. at 10–11 [Doc. No. 32].)  Like Plaintiffs, Honeywell asserts that the 2007 and 2010 CBAs are unambiguous.  (See id. at 14.)  However, it reads them as unambiguous in its favor, arguing that the agreements did not permanently vest pre-65 healthcare benefits.  (Id.)  Rather, Honeywell contends, not only did the CBAs lack explicit vesting language, any promises for pre-65 retirees' healthcare benefits were subject to the general durational language in the agreements and Honeywell's reservation of rights in the SPDs to terminate or alter the plans at any time.  (Id. at 11–19.)  Because it finds the contract language unambiguous, it asserts that any reliance on extrinsic evidence is improper.  (Id. at 29–30.)  Second, Honeywell asserts that Plaintiffs cannot demonstrate irreparable harm because nine months prior to the filing of the instant motion, the Union—then representing Plaintiffs—agreed that Honeywell

12

would not extend healthcare benefits beyond December 31, 2017.  (Id. at 32.)  Moreover,

the delay in time between Honeywell's March 2017 notice of termination and the filing of

the instant motion, Honeywell argues, negates Plaintiffs' claim of irreparable harm and

constitutes sufficient reason to deny the motion.  (Id. at 33–35.)  It contends that the delay

undercuts any claimed urgency and, considering the balance of harms, renders a

preliminary injunction inequitable as "Honeywell would be burdened by an injunction

forcing it to continue paying benefits while this litigation proceeds."  (Id. at 35.)  It

estimates that monthly coverage for Plaintiffs costs Honeywell at least $368,000 per

month.  (Id.)  Finally, Honeywell argues that the public interest weighs in favor of

denying Plaintiffs' motion, as Honeywell should not be "forc[ed] . . . to pay for insurance

benefits that it never contractually agreed to provide and never understood to be vested."

(Id. at 36.)

Following the issuance of the December 29, 2017 Order granting injunctive relief

through January 31, 2018, Honeywell filed an appeal with the Eighth Circuit Court of

Appeals and moved for an expedited hearing.  See Pacheco v. Honeywell, 18-1006, (8th

Cir.), Def.'s Mot. to Expedite.  The Eighth Circuit denied Honeywell's motion for an

expedited briefing schedule and hearing.  Id., Jan. 26, 2018 Order.  The appeal remains

pending and briefing has not yet been filed.

## II.    DISCUSSION

This Court must consider four factors to determine whether preliminary injunctive

relief is warranted:  (1) the movant's likelihood of success on the merits; (2) the threat of

irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm injunctive relief would cause to the other litigants; and (4) the public interest.  <u>Dataphase Sys., Inc. v. CL Sys., Inc.</u>, 640 F.2d 109, 114 (8th Cir. 1981) (*en banc*); <u>accord</u> <u>Watkins, Inc. v. Lewis</u>, 346 F.3d 841, 844 (8th Cir. 2003) (quoting <u>Dataphase</u>).  To analyze these factors, the Court must "flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene."  <u>Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.</u>, 182 F.3d 598, 601 (8th Cir. 1999).  A preliminary injunction "is an extraordinary remedy never awarded as a matter of right."  <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 24 (2008).  The burden of establishing the four <u>Dataphase</u> factors lies with the party seeking injunctive relief.  <u>Watkins</u>, 346 F.3d at 844.

      **A**.    **Irreparable harm**

"The basis of injunctive relief in the federal courts has always been irreparable harm and the inadequacy of legal remedies."  <u>Bandag, Inc. v. Jack's Tire & Oil, Inc.</u>, 190 F.3d 924, 926 (8th Cir. 1999) (per curiam) (quoting <u>Beacon Theatres, Inc. v. Westover</u>, 359 U.S. 500, 506–07 (1959)).  If monetary damages can compensate the plaintiff for the threatened harm, an adequate remedy at law exists, precluding injunctive relief.  <u>See</u> <u>Northland Ins. Cos. v. Blaylock</u>, 115 F. Supp. 2d 1108, 1116 (D. Minn. 2000) (citing <u>In re Travel Agency Comm'n Antitrust Litig.</u>, 898 F. Supp. 685, 689 (D. Minn. 1995)).  The availability of monetary relief to compensate a portion of the harm does not preclude injunctive relief as to "other less tangible injuries [that] cannot be so easily valued or

14

compensated." <u>Glenwood Bridge, Inc. v. Minneapolis</u>, 940 F.2d 367, 371–72 (8th Cir. 1991).

The Court finds that Plaintiffs have demonstrated irreparable harm, absent the issuance of injunctive relief. Plaintiff Vicki Hansen attests that she gave up her job at Honeywell and took early retirement in January 2013 in reliance on Honeywell's promise of pre-65 healthcare benefits. (Ex. 18 to Pls.' Mot. (Hansen Decl. ¶ 6).) She contends that replacement medical coverage for her and her husband would cost approximately $2,171 per month, with a $900 per person deductible, and an out-of-pocket maximum of $6,500 per person. (<u>Id.</u> ¶ 7.) In contrast, under the pre-65 Honeywell plan, Hansen currently has a $200 per person deductible, with an out-of-pocket maximum of $2,000 per person. (<u>Id.</u>) With her monthly Honeywell pension check of $2,926, she contends that if she were required to obtain replacement healthcare coverage, she would have approximately $400, after taxes, with which to pay deductibles, living expenses, and other necessities. (<u>Id.</u> ¶ 8.) In addition to this financial harm, Hansen maintains that absent injunctive relief, the quality of life that she and her husband enjoy would deteriorate. (<u>Id.</u> ¶ 9.) Not only is the stress caused by the direct loss of healthcare benefits and its attendant financial consequences a source of worry and anxiety, equally concerning is the prospect of having to choose between healthcare and other necessities of life. (<u>Id.</u>)

Fellow pre-65 retiree Gregory Harrer similarly asserts that comparable replacement insurance would cost about $1,129 per month. (Ex. 19 to Pls.' Mot. (Harrer Decl. ¶ 7).) Even if he qualified for a state subsidy, assuming it remains available, he

would be required to spend much of his Honeywell pension on replacement healthcare coverage. (Id.) He notes that if his healthcare benefits are terminated, he will have to "limit [his] medical treatment and choose between healthcare and other necessities," seriously impacting his quality of life. (Id. ¶ 8.) Based on his conversations with other Minnesota retirees, he understands that they share similar concerns. (Id.)

This Court has observed that "the mere threat of termination of medical benefits" constitutes irreparable injury, Teamsters Local No. 120 v. Marathon Petroleum Co. LLC, No. 06-cv-3431 (PAM/JSM), 2006 WL 2971667, at *6 (D. Minn. Aug. 29, 2006) (citing Commc'ns Workers of Am. Dist. One, AFL-CIO v. NYNEX Corp., 898 F.2d 887, 891 (2d Cir. 1990)), and, similarly, that "the termination of health insurance benefits of individuals on fixed incomes presents a sufficient threat of irreparable harm to warrant injunctive relief." Id. (citing Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. White Farm Farm Equip. Co., No. CV-4-84-770, 1984 WL 4605, at *4 (D. Minn. Oct. 19, 1984)). In White Farm, this Court found that losing medical benefits "might well [force fixed-income retirees] to forgo other necessities of life such as food, clothing, or shelter," 1984 WL 4605, at *4, similar to the concerns that Ms. Hansen and Mr. Harrer raise here, with the accompanying emotional distress. As the court in LaForest v. Honeywell, International, Inc. observed:

> Justice Breyer, when a member of the First Circuit Court of Appeals succinctly pointed out that certain general facts are commonly believed or have been held to constitute irreparable harm concerning retirees and reductions in medical benefits, such as: '(1) most retired union members are not rich; (2) most live on fixed incomes; (3) many will get sick and need

medical care; (4) medical care is expensive; (5) medical insurance, is therefore, a necessity; (6) some retired workers find it difficult on their own while others pay for it only out of money that they need for other necessities of life. . . .'  It is easy to understand that emotional distress is likely to follow termination of retiree medical insurance benefits.

No. 03-cv-6248T, 2003 WL 23180220, at * 2 (W.D.N.Y. 2003) (quoting United Steelworkers of Am. v. Textron, Inc., 836 F.2d 6, 8 (1st Cir. 1987)).  Moreover, monetary damages are insufficient compensation for sacrificing medical care or being denied such care.  See Marathon Petroleum, 2006 WL 2971667, at *6 (citing United Steelworkers of Am. v. U.S. Steel Corp., Civ. No. 5–77–76, 1977 WL 1720, at *6 (D. Minn. Sept. 2, 1977)).

Honeywell contends that Plaintiffs' own delay in filing suit undercuts their claims of irreparable harm.  (See Def.'s Opp'n Mem. at 32–33.)  The Court disagrees.  True, courts have found that under some circumstances, delay in seeking injunctive relief may justify its denial.  See, e.g., Hubbard Feeds, 182 F.3d at 603.  But as noted earlier, the delay here is one of a few months, not years, and the Court is unaware of when Plaintiffs first obtained counsel.  The cases that Honeywell cites in support of its position are not sufficiently similar to the facts here.  See Tarek ibn Ziyad Academy v. Islamic Relief USA, 794 F. Supp. 2d 1044, 1059 (D. Minn. 2011) (noting that charter school had been aware of impending changes in Minnesota law, and that its sponsor declined to challenge the constitutionality of the statutory changes, for a two-year period before seeking relief); Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc., No. 09-cv-1091 (JNE/JSM), 2010 WL 2131007, at *1 (D. Minn. May 25, 2010) (observing that plaintiffs knew of the allegedly

17

false advertisements for several years before bringing suit); Key Med. Supply, Inc. v. Sebelius, No. 12-CV-752 (DWF/JJG), 2012 WL 1072328, at *3 (D. Minn. Mar. 30, 2012) (noting plaintiffs' delay of several months in seeking relief, but delay was not the sole reason for denying relief); CHS, Inc. v. PetroNet, LLC, No. 10-cv-94 (RHK/FLN), 2010 WL 4721073, at * 3 (D. Minn. Nov. 15, 2010) (identifying a delay of eight months between filing of complaint and motion for injunctive relief, in addition to injury that appeared to be monetarily compensable); Nelson v. Faithful Fin., LLC, No. 10-cv-3405 (JNE/JJG), 2010 WL 3384795, at *3 (D. Minn. Aug. 25, 2010) (noting that plaintiffs received notice of foreclosure, postponed the sale for five months, then waited six months before seeking expedited injunctive relief); Clam Corp. v. Innovative Outdoor Sols., Inc., No. 08-cv-5895 (DSD/AJB), 2008 WL 5244845, at *4 (D. Minn. Dec. 15, 2008) (observing that plaintiff had been aware of allegedly infringing trademarked product for the preceding year). Rather, the "delay" here is one of a few months between the notice of termination and the filing of the lawsuit. Given the overwhelming prospect of irreparable harm, the significance of the delay here is minimal and does not negate the Court's finding of irreparable harm.

For all of the foregoing reasons, the Court finds that Plaintiffs have satisfactorily shown a threat of irreparable harm absent a preliminary injunction.

## B.    Likelihood of Success

In order to obtain a preliminary injunction, Plaintiffs must show that they have a "fair chance of prevailing" on their claims. Planned Parenthood Minn., N.D., S.D. v.

Rounds, 530 F.3d 724, 732 (8th Cir. 2008). "An injunction cannot issue if there is no chance on the merits." Mid-Am. Real Estate Co. v. Ia. Realty Co., 406 F.3d 969, 972 (8th Cir. 2005). The moving party need not show a "greater than fifty percent likelihood" of success, but must demonstrate its claims provide "fair ground for litigation." Watkins, 346 F.3d at 844. "In considering the likelihood of the movant prevailing on the merits, a court does not decide whether the movant will ultimately win." PCTV Gold, Inc. v. SpeedNet, LLC, 508 F.3d 1137, 1143 (8th Cir. 2007) (citation omitted).

Central to the Court's analysis here is the U.S. Supreme Court's decision in M & G Polymers USA, LLC v. Hobert Freel Tackett, 135 S. Ct. 926 (2015). Tackett involved an open-ended CBA provision for retiree insurance benefits that the Sixth Circuit found ambiguous as to duration. Id. at 934. The appellate court applied the reasoning of an earlier Sixth Circuit decision, International Union, United Auto., Aerospace, & Agricultural Implement Workers of America v. Yard-Man, Inc., 716 F.2d 1476 (6th Cir. 1983), drawing inferences from the "context" of labor negotiations to resolve the contractual ambiguity. Id. at 932 (citing Tackett I, 561 F.3d 478, 490 (6th Cir. 2009)). Although the CBA contained a general durational clause, the Sixth Circuit found it "unlikely" that the employees' union would have agreed to CBA language that ensured a full company contribution if the employer could have unilaterally changed those terms. Id. (citing Tackett I, 561 F.3d at 490)). The Sixth Circuit thus found the existence of a fact question as to whether the retiree benefits vested for life. Id.

The Supreme Court disagreed. Writing for the majority, Justice Thomas stated

19

that contractual provisions in CBAs are to be enforced as written and interpreted in accordance with "ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy." Id. at 933. As with any contract, "the parties' intentions control." Id. (citing Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 682 (2010)). Where the terms of the contract are unambiguous, it is to be construed "in accordance with its plainly expressed intent." Id. (quoting 11 R. Lord, Williston on Contracts § 30:6, p. 108 (4th ed. 2012) (Williston)). Courts may not speculate as to the intentions of employees, unions, and employers in negotiating retiree benefits, but must ground their assessments on record evidence. See id. at 935. Thus, courts may consider certain known customs or industry usages to construe a contract, but "the parties must prove those customs or usages using affirmative evidentiary support in a given case." Id. (citing 12 Williston § 34:3).

When faced with ambiguous language, Justice Thomas advised that courts "should not construe ambiguous writings to create lifetime promises." Id. at 936 (citing 3 A. Corbin, Corbin on Contracts § 533, p. 216 (1960)). Rather, courts should be guided by the "traditional principle that 'contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement.'" Id. at 937 (quoting Litton Fin. Printing Div., Litton Bus. Sys., Inc. v. NLRB, 501 U.S. 190, 207 (1991)). While a CBA may explicitly provide that certain terms continue after the agreement's expiration, when a contract fails to address the duration of retiree benefits, "a court may not infer that the parties intended those benefits to vest for life." Id.

In her concurring opinion, Justice Ginsburg expounded upon Justice Thomas's adherence to fundamental principles of contract law, stating that when the parties' intent is unambiguously expressed in the contract, that intent controls, and the court's analysis should go no further. Id. at 938 (Ginsburg, J., concurring) (citing 11 R. Lord, Williston on Contracts § 30:2, p. 98–104) (4th ed. 2012) (Williston)). However, when faced with ambiguity, courts may consider extrinsic evidence to determine the parties' intentions. Id. (citing 11 Williston § 30:7, at 116–24). Justice Ginsburg further observed that there is no rule requiring "clear and express" language in order to demonstrate that the parties intended healthcare benefits to vest. Id. Rather, "'[C]onstraints upon the employer after the expiration date of a collective-bargaining agreement,' we have observed, may be derived from the agreement's "explicit terms," but they 'may arise as well from . . . implied terms of the expired agreement.'" Id. (alterations in original) (quoting Litton, 501 U.S. at 203, 207).

Applying these fundamental contractual precepts in Tackett, the Supreme Court remanded the matter to the Sixth Circuit with instructions to apply ordinary principles of contract law. Id. at 937.

It appears that post-Tackett, Honeywell has proposed the termination of healthcare benefits to retirees in other parts of the country, and the parties here have referred to these other decisions. As the court in one such case recognized, the agreements in other cases invariably differ from those in the case at hand, as each local union bargained with Honeywell to achieve different results. See Kelly v. Honeywell Int'l, Inc., 233 F. Supp.

21

3d 303, 312 (D. Conn. 2017) (citations omitted).  Nevertheless, to the extent that some

common features or distinctions exist, the Court briefly examines these decisions.

In Fletcher v. Honeywell, 238 F. Supp. 3d 992, 994 (S.D. Ohio 2017), the court

found the CBA language ambiguous concerning the parties' intent to vest lifetime retiree

healthcare benefits.  Following an evidentiary hearing, the court considered the live

testimony of four witnesses and the deposition testimony of four other witnesses.  Id. at

994–95.  Given that evidence, the court determined that the CBA reflected the parties'

understanding that Honeywell would provide lifetime healthcare coverage for its retirees.

Id. at 999–1000.

To shed light on the parties' intentions behind the CBAs at issue, the court also

considered evidence of subsequent bargaining—namely, evidence of a one-year window

of opportunity to retire, prior to Honeywell's elimination of healthcare benefits for all

retirees who retired after June 1, 2012.  Id. at 1007.  The court explained,

> The parties' understanding that the retirees had lifetime healthcare benefits
> formed the premise behind the creation of this window of opportunity. It is
> inconceivable that nearly half of the union employees at the Greenville
> plant would agree to voluntarily retire based solely on a promise that they
> would continue to receive healthcare benefits only until May 22, 2014,
> when the CBA expired.  Accordingly, evidence of what transpired during
> and after the 2011 negotiations provides additional support for a finding
> that the parties intended that Honeywell would provide lifetime retiree
> healthcare benefits.

Id. at 1007–08.  The Fletcher ruling is on appeal to the Sixth Circuit.

In another recent Honeywell case, the court in Cooper v. Honeywell International,

Inc., No. 1:16-cv-4712017, 2017 WL 213997, at * 1 (W.D. Mich. Jan. 6, 2017), issued a

22

short order, granting the plaintiffs' motion for a preliminary injunction, referring to the reasons stated on the record. This case involves pre-age 65 healthcare benefits. See Cooper, No. 1:16-cv-4712017 (W.D. Mich.), Compl. 15-21 [Doc. No. 1]. In the ruling, the court stated that it would not terminate the plaintiffs' healthcare coverage while the merits of the suit were underway, finding that after "the weighing and balancing of the relevant equities," injunctive relief was warranted to preserve the parties' relative positions. Cooper, 2017 WL 213997, at * 1. This case is on appeal to the Sixth Circuit.

In Kelly, which involved lifetime benefits, the court found that the CBAs contained a general durational clause, but no reservation of rights clause, distinguishing them from the CBAs in Abbruscato v. Empire Blue Cross & Blue Shield, 274 F.3d 90, 94 (2d Cir. 2001) (finding that language regarding retirees' life insurance coverage did not promise vested lifetime benefits where same agreement contained reservation of rights to end the plan). 233 F. Supp. 3d at 313. Thus, as to retirees who retired before the expiration of the agreements, the court found that the "for the life of" language unambiguously indicated a contractually vested right to lifetime medical benefits. Id. at 316. As to another subclass of employees who retired after the applicable CBAs expired, the court permitted the development of the record, id. at 318, and later found that this subclass was not entitled to benefits. See Kelly v. Honeywell Int'l, Inc., No. 3:16-cv-00543 (VLB), 2017 WL 776543, at * 2 (D. Conn. Feb. 28, 2017). Subsequently, however, it appears that these plaintiffs may have prevailed on reconsideration, as the court granted their motion for a preliminary injunction, finding that they had received no

23

notice of the termination of their benefits.  See Kelly v. Honeywell Int'l, Inc., No. 3:16-cv-0054 (VLB), 2017 WL 2798249, at *1 (D. Conn. June 27, 2017).   Some of these rulings appear to be on appeal before the Second Circuit.

Thus far, the Sixth Circuit is the only appellate court to have ruled in a Honeywell retiree benefits suit, post-Tackett, in Watkins v. Honeywell International, Inc., 875 F.3d 321 (6th Cir. 2017).  Addressing different CBA language and facts, that court affirmed the district court's dismissal of the retirees' suit.  The district court, in granting Honeywell's motion, found the CBA unambiguous, requiring no extrinsic evidence of intent.  Id. at 323.  It contrasted the CBA language concerning pension plans—which explicitly vested for life—with the language concerning healthcare benefits, finding no such durational statements.  Id.  Specifically, the language applicable to healthcare benefits in the "Insurance" section of the Watkins CBA expressly limited its terms, stating, "For the duration of this Agreement, the Insurance Program shall be that which is attached hereto . . . ."  (Ex. 1 to Def.'s Dec. 21, 2017 Letter (Watkins CBA at 95) [Doc. No. 34-1].)  The Watkins Insurance Program, "attached" to the CBA, contained no durational limits, as the Sixth Circuit and district court found.  (See Ex. 2 to Def.'s Dec. 21, 2017 Letter (Watkins Ins. Program at 53–54 [Doc. No. 34-2].)  This language, or lack thereof, is completely different from the specific, to-age-65 language found in Article 24, Section 7 of the 2007 and 2010 CBAs in this case, as discussed in greater detail below. (See Exs. 3 & 5 to Pls.' Mot. (2007 CBA & 2010 CBA at Art. 24, § 7).)

Other recent, post-Tackett decisions are also instructive.   In Matthews v. Chicago

24

Transit Authority, Nos. 117638, 11777713, 117728, 2016 IL 117638, at *24 (Ill. May 5, 2016), the court considered pre-65 retiree health insurance benefits. Specifically, the language in question stated, "This benefit terminates when the retiree attains age 65." Id. at *25. The court found that the right to the benefits vested when the employee fulfilled all of the necessary qualifications and obligations to enjoy it: "Where a retiree is under age 65 and has fulfilled the other prerequisites necessary to establish eligibility, the right to the retiree health care benefit is fully accrued." Id. (citations omitted).

The Fourth Circuit found that retiree health care benefits did not vest for life in Barton v. Constellium Rolled Prods.-Ravenswood, LLC, 856 F.3d 348, 354 (4th Cir. 2017), noting a lack of durational language. However, the court contrasted the language at issue with that in an earlier decision, Keffer v. H.K. Porter Co., 872 F.2d 60 (4th Cir. 1989), in which "retiree health benefits were explicitly linked not to termination of the agreement, but to a post-termination event, namely the date of the retiree's eligibility for Medicare." Id. (quoting Dewhurst v. Century Aluminum Co., 649 F.3d 287, 292 (4th Cir. 2011) (discussing Keffer)).

Two recent Sixth Circuit decisions involving retiree healthcare benefits, which the plaintiffs argued vested for life, found the CBAs in question unambiguous and not so sufficiently specific as to override the general durational clauses found in the respective CBAs. See Cole v. Meritor, Inc., 855 F.3d 695, 700 (6th Cir. 2017); Gallo v. Moen, 813 F.3d 265, 273–74 (6th Cir. 2016). In Gallo, the court noted that "[a]bsent a longer time limit in the context of a specific provision, the general durational clause supplies a final

phrase to every term in the CBA." 813 F.3d at 269.

Following Tackett and the guidance of these subsequent decisions, the Court examines the four corners of the applicable CBAs here to determine whether the language in question unambiguously expresses the contracting parties' intentions. See Tackett, 135 S. Ct. at 933. While Honeywell argues that the 2007 CBA is silent as to retiree healthcare benefits being vested, the Court disagrees.

The 2007 agreement makes clear that the provision in question applies to "Retiree Health Care (Pre 65 only)," and that Honeywell "does not provide healthcare benefits for Local 1145 retirees after age 65." (See Ex. 3 to Pls.' Mot., Art. 24, § 7.) The pre-65 benefits provision then describes Honeywell's levels of contribution for post-retirement health benefits depending on whether the employees retired before May 1, 2007 or after April 30, 2007. (Id.) Honeywell contends that any right to benefits expired upon the stated expiration of the CBA on January 31, 2010, citing the CBA's general durational clause in Article 35, Section 1. But the language of Section 7 contemplates extension of the pre-65 benefits beyond the term of the CBA. Section 7 states:

> The maximum annual dollar amount contributed by Honeywell for post April 30, 2007 retirees, their dependents, and surviving spouses will be limited to $20,304 for single coverage and $40,608 for family coverage.

> The above limit on Company retiree health care contributions will not apply to any year prior to calendar year 2011.

(Id. at 27–28) (emphasis added).

The Court finds that the age limit (pre-65) in Section 7 is sufficiently specific in

26

duration.  Moreover, in this very section of the CBA, Honeywell agreed that its future

annual contribution limits for post-April 30, 2007 retirees would not go into effect until

2011—in a contract with a general duration clause ending on January 31, 2010.

The language in the 2010 CBA is similarly unambiguous.  Again, the healthcare

benefits are of specific duration, available to pre-65 retirees only.  (See Ex. 5 to Pls.'

Mot., Art. 24, § 7.)  As with the 2007 CBA, Honeywell stated, "The Company does not

provide healthcare benefits for Local 1145 retirees after age 65."  (Id.)

Moreover, in the additional language for the "Special Retirement Program,"

Honeywell stated that it would make no contributions to pre-65 retirees' medical

premiums, except for:

> Employees who provide the Company with at least four (4) months advance
> written notice of his or her irrevocable decision to retire on a date certain
> between August 1, 2010 and February 1, 2013 and are not terminated for
> cause will be eligible for retiree medical coverage under the 1145 retiree
> medical plan with respect to which Honeywell will contribute towards the
> annual retiree medical premium.
>                                   * * *
> The Company does not provide healthcare benefits for Local 1145 retirees
> after age 65.

(Id. at 38) (emphasis added).  This constituted an express promise of specific duration.

Consistent with this promise, Honeywell agreed to provide healthcare benefits to eligible

employees who complied with the notice and termination requirements and retired

between August 1, 2010 and February 1, 2013.  For example, under this language, for an

employee who retired on January 31, 2013—technically, the last day of the term of the

agreement, per the general durational clause (id., Art. 31, § 1)—Honeywell agreed to pay

that retiree's premiums and healthcare benefits <u>after</u> the expiration of the agreement, until the retiree reached age 65. This express promise makes clear that even though the durational clause generally terminated the 2010 CBA on January 31, 2013, (<u>see id.</u>), the pre-65 retiree healthcare benefits vested and extended beyond that date to a date certain (i.e., age 65 of the respective retirees).

While a durational clause may show an intent to limit healthcare benefits to the duration of the agreement, as Defendant argues, Justice Thomas observed in <u>Tackett</u> that "we have already recognized that a collective bargaining agreement [may] provid[e] in explicit terms that certain benefits continue after the agreement's expiration." 135 S. Ct. at 937 (citation omitted). This is consistent with general principles of contract law, in which "'specific terms of a contract govern over the general in the event of conflict.'" <u>Thomsen v. Famous Dave's of Am., Inc.</u>, 606 F.3d 905, 910 (8th Cir. 2010) (quoting <u>Medtronic, Inc. v. ConvaCare, Inc.</u>, 17 F.3d 252, 255 (8th Cir. 1994)).

Consistent with Justice Thomas's directive in <u>Tackett</u>, the plainly expressed intent of the parties must control. <u>See</u> 135 S. Ct. at 933 (citations omitted). The Court finds that the language of the CBAs here unambiguously provides for the vested healthcare coverage of pre-65 retirees until they reach age 65, along with the durational limits applicable to the retirees' dependents. As Justice Ginsburg observed in her <u>Tackett</u> concurrence, the law does not require "clear and express" language in order to demonstrate that the parties intended healthcare benefits to vest. <u>Id.</u> at 938 (Ginsburg, J., concurring). The language here is sufficiently clear and specific and is in accord with

28

authority that requires clear expressions of intent to vest in order to override general durational clauses.  See, e.g., Crown Cork & Seal Co., Inc. v. Int'l Assoc. of Machinists & Aerospace Workers, 501 F.3d 912, 917 (8th Cir. 2007); John Morrell & Co. v. United Food & Com. Workers Int'l, AFL-CIO, 37 F.3d 1302, 1307 (8th Cir. 1994); Anderson v. Alpha Portland Indus., Inc., 836 F.2d 1512, 1519 (8th Cir. 1988).  And unlike Justice Thomas's concern that ambiguous writings not be construed "to create lifetime promises," Tackett, 135 S. Ct. at 936 (citation omitted), the writings here are neither ambiguous, nor do they give rise to lifetime promises.

In Honeywell's motion to the Eighth Circuit for an expedited hearing on its appeal of this Court's December 29, 2017 ruling, it addressed the merits, arguing that the pre-65 CBA language merely limited eligibility for benefits, but did not define the duration of those benefits.  See Pacheco, 18-1006 (8th Cir.), Appellant's Mot. to Expedite at 11–12. The Court disagrees.  While being under 65 years old is a component of eligibility for the healthcare benefits—and is one of several eligibility requirements in the 2010 CBA, which also calls for advance written notice of early retirement and no termination for cause—it primarily concerns the temporal limit of coverage.  Both the 2007 and 2010 CBAs state, "[Honeywell] does not provide healthcare benefits for Local 1145 retirees after age 65."  (Ex. 3 to Pls.' Mot., Art. 24, § 7; Ex. 5 to Pls.' Mot., Art. 24, § 7) (emphasis added).

In its motion to the Eighth Circuit, Honeywell also argued that "the district court erred by relying on extrinsic evidence to 'support[ ] [its] finding that the contracting

29

parties intended for the pre-65 retirees' benefits to vest.'" See Pacheco, 18-1006 (8th

Cir.), Appellant's Mot. to Expedite at 14)) (citing Dec. 29, 2017 Order at 29).  Honeywell

misstated the clear bases for this Court's provisional ruling.  In the provisional ruling, as

here, the Court found that the language in the 2007 and 2010 CBAs unambiguously

vested healthcare benefits of specific duration to pre-65 retirees and their families  (See

Dec. 12 Order at 27.)  And, this Court ruled, clearly in the alternative, that extrinsic

evidence supported a finding that the parties intended the vesting of the pre-65 retirees'

healthcare benefits, stating, "even if the language were ambiguous, the current record

evidence, while limited, given the early posture of this case, sufficiently supports the

finding that the contracting parties intended for the pre-65 retirees' benefits to vest from

retirement until they reached age 65."  (Id. at 29) (emphasis added).   The Court did not

improperly consider extrinsic evidence.  Honeywell's representations to the contrary

contradict the plain language of this Court's ruling.

Again, the Court finds—in the alternative—that even if the CBA language were

ambiguous, Plaintiffs have submitted evidence reflecting the intent to vest with respect to

the 2007 CBA through Honeywell Q&A documents, (see Ex. 4 to Pls.' Mot. (Answers to

Question at 2)), and the 2010 CBA through similar Honeywell Q&A documents, (see Ex.

7 to Pls.' Mot. (Pension & Medical Document)), Honeywell-sponsored presentations,

(see Ex. 8 to Pls.' Mot. (Honeywell Retirement Planning Sessions); Ex. 19 to Pls.' Mot.

(Harrer Decl. ¶ 5)), personal discussions between prospective retirees and Honeywell's

Human Resources staff, (see Ex. 18 to Pls.' Mot. (Hansen Decl. ¶¶ 4-6)), and

30

Honeywell's informational handouts on the application and enrollment process in the

Special Retirement Program.  (See Ex. 9 to Pls.' Mot. (Special Retirement Process); Ex.

11 to Pls.' Mot. (Enrollment Worksheet).)  In addition, Ms. Hansen and Mr. Harrer

contend that they would not have relinquished their employment if Honeywell had

informed them that it would terminate their healthcare coverage before age 65.  (See

Hansen Decl. ¶ 6; Harrer Decl. ¶ 6.)   Instead, both gave up their jobs based on

Honeywell's representations to provide healthcare benefits up to age 65.  (Id.)

In contrast to Plaintiffs' evidence concerning Honeywell's representations of

guaranteed healthcare coverage, in Stearns, the Eighth Circuit noted that the employer's

representatives in that case had advised prospective plan participants at seminars and

through broadcasts that the retirement healthcare benefits were subject to modification.

See 297 F.3d at 709.  No such evidence has been presented to the Court in this case.

Discovery here may ultimately yield similar evidence, but at this stage of the litigation,

the Court finds that Plaintiffs have sufficiently shown the parties' intent to vest the

limited pre-65 health care benefits, if the CBA language is considered ambiguous.  This

evidence supports the Court's alternative basis for finding that Plaintiffs have shown a

fair chance of prevailing on the merits.

As Justice Thomas noted, courts may also consider certain known customs or

industry usages to construe a contract, if the parties provide sufficient evidentiary support

in the record.  Tackett, 135 S. Ct. at 935 (citing 12 Williston § 34:3).  Here, Honeywell's

prior practices shed additional light on whether it intended to offer vested healthcare

benefits to age 65 to its pre-65 retirees, and support such a finding.   (See Ex. 1 to Pls.'
Mot. (FAQ at 7); Ex. 2 to Pls.' Mot. (2001 Agmt. at 68).)   Plaintiffs allege that for more
than 30 years prior to the 2007 CBA, Honeywell provided healthcare benefits to its early
retirees starting at retirement, and continuing after the expiration of the applicable CBA,
until the retiree reached 65.  (Compl. ¶ 20.)  Moreover, although the Court does not
consider Honeywell's payments for healthcare coverage to Plaintiffs, post-dating the
expiration of the applicable CBAs, to constitute a waiver of its position regarding
termination of those benefits, the Court notes that Honeywell made such payments for
years, until recently.

       Honeywell further argues that the reservation-of-rights language in the SPDs
"confirm[s] that benefits were not permanently vested."  (Def.'s Opp'n Mem. at 19.)  This
language included the reservation to terminate the plans at any time.  (See, e.g., Ex. 3 to
Jacobs Decl. (2007 BCBS PPO SPD at 97, 115); Ex. 4 to Jacobs Decl. (2007 United
Healthcare Choice Plus PPO SPD at 103, 121); Ex. 5 to Jacobs Decl. (2011-2013 BCBS
PPO SPD at 123, 141); Ex. 6 to Jacobs Decl. (United Healthcare Choice Plus PPO SPD at
128, 147).)  As Honeywell notes, the Eighth Circuit has held that "an unambiguous
reservation-of-rights provision is sufficient without more to defeat a claim that retirement
welfare plan benefits are vested," and that "there must be an affirmative indication of
vesting in the plan documents to overcome an unambiguous reservation of rights."
(Def.'s Opp'n Mem. at 20) (citing Maytag Corp. v. Int'l Union, United Auto., Aerospace
& Agric. Implement Workers of Am., 687 F.3d 1076, 1085 (8th Cir. 2012) (finding that

32

retiree class lacked vested health care benefits where plan contained no indication of

vesting whereas SPD language expressly stated, "The benefits described in this booklet

are not vested benefits" and Maytag reserved its rights to modify any components of the

plan); Stearns v. NCR Corp., 297 F.3d 706, 712 (8th Cir. 2002) (concluding that certain

lifetime health care benefits were not vested, as no affirmative indication of vesting in the

plan documents could overcome the unambiguous reservation of rights provision); Crown

Cork & Seal Co., 501 F.3d at 918 (holding that language providing personal coverage

"until your death," was not explicit vesting language and was inconsistent with a cap on

lifetime benefits and reservation-of-rights language); Hutchins v. Champion Int'l Corp.,

110 F.3d 1341, 1345–46 (8th Cir. 1997) (rejecting retiree's argument that disability

benefits vested merely by virtue of receiving said benefits; no express language vested

benefits and reservation of rights clause permitted former employer to terminate benefits

during retiree's period of incarceration); United Paperworkers Int'l Union, AFL-CIO,

CLC v. Jefferson Smurfit Corp., 961 F.2d 1384, 1385 (8th Cir. 1992) (declining to permit

an oral modification to a written, unambiguous ERISA welfare benefit plan where plan

contained no reference to vested lifetime benefits or fixed premiums and employer

reserved right to modify plan); Anderson, 836 F.2d at 1518–19) (finding that lifetime

benefits were only to last for the duration of the CBA, relying, in part, on reservation of

rights language).  Here, however, as set forth above, the CBAs provide an affirmative

indication of vesting the pre-65 healthcare benefits.

       Unlike the benefits in the cases on which Honeywell relies, the benefits here are

not open-ended "lifetime" benefits.  In <u>John Morrell</u>, 37 F.3d at 1307–08, while the Eighth Circuit rejected the retirees' argument that certain carve-out language in the CBA vested <u>all</u> healthcare benefits, the court distinguished general, non-vesting lifetime benefits language from more specific language that conferred vested benefits upon a limited group, for a limited period.  Specifically, the court observed that healthcare benefits vested for a group of retirees between ages 50 and 54 who, following a plant closing, had elected a separation pension for a five-year period.  <u>Id.</u> at 1308.  The benefits at issue here are of similarly limited duration, conferred upon a similarly limited class of retirees.

As noted earlier, to demonstrate a likelihood of success on the merits, a party seeking injunctive relief is only required to demonstrate that its claims provide "fair ground for litigation."  <u>Watkins</u>, 346 F.3d at 844.  For the reasons noted above, the Court finds that Plaintiffs have met that standard.

## C.    **Remaining <u>Dataphase</u> Factors**

The balance between the threat of irreparable harm to Plaintiffs absent injunctive relief and the injury to Honeywell if injunctive relief is granted weighs in favor of Plaintiffs.   In its motion to the Eighth Circuit, Honeywell emphasized the ensuing financial risk that this Court's injunction imposes, albeit as a basis for seeking an expedited hearing.  <u>See</u> <u>Pacheco</u>, 19-1006 (8th Cir.), Appellant's Mot. to Expedite at 9. Moreover, Honeywell stressed that "because the majority of the class members are

quickly approaching 65, a great part of Honeywell's costs will be incurred within the next year or so. . . ." Id. Honeywell's acknowledgment that "the majority" of Plaintiffs are approaching the 65 durational limit of coverage shows that its financial injury is limited. Therefore, the balance of harms weighs in favor of issuing the preliminary injunction.

As to the final Dataphase factor of the public interest, the Court finds that the public interest is served by promoting the contracting parties' intentions, particularly in matters as critical as healthcare coverage.

In conclusion, because the application of the Dataphase factors weighs in Plaintiffs' favor, their request for a preliminary injunction is granted, pending an adjudication on the merits of Plaintiffs' claims or further order of this Court after notice and hearing.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.    Plaintiffs' Motion for a Preliminary Injunction [Doc. No. 18] is **GRANTED**;

2.    Defendant Honeywell International, Inc. is preliminarily enjoined from terminating the healthcare benefits of the Minnesota retirees under age 65, and their families and surviving spouses, pending an adjudication on the merits of Plaintiffs' claims or further order of this Court after notice and hearing; and

3.    The posting of a security bond is not required.

Dated:   January 31, 2018                 s/Susan Richard Nelson
                                          SUSAN RICHARD NELSON
                                          United States District Judge